is Saunders v. the Sheriff of Brevard County. Good morning, folks, and you may proceed. Thank you. Thank you. Thank you. Is the court Aaron Touche for the Brevard County Sheriff and the individual defendants Jeter and Wright? The core of our argument in this appeal is that there was no constitutional violation when it came to the conditions of confinement at the Brevard County Jail. When Plaintiff Obrist Saunders was incarcerated there, there's an important note as far as the analysis, and the district court and the plaintiff, it appears, would like this court to analyze the conditions kind of in one whole lump of conditions of confinement instead of separating them out as far as each deprivation of need, each allegedly unconstitutional condition. But the correct analysis is to take each condition and analyze them by itself instead of taking it all together. And the plaintiff complains of several different categories of allegedly unconstitutional conditions, and I will address them each on their own. The first is that he alleges the cells in the mental health unit were overcrowded. In support of this, the plaintiff says he was in a hundred square foot cell in his complaint. Then later on in deposition he says nine by twelve or nine fifteen foot cells, so we're not sure which cells he's talking about there, it's a little unclear. And he also testifies in deposition that sometimes there were up to eight people in the cell with him, sometimes six, seven, five, sometimes three or four. People were always coming and going and the population would change by the hour. So this really at most alleges a short-term crowding in the cells. It doesn't allege any sort of long-term lasting crowding situation. The plaintiff advances the Florida model jail standards as the standard for cell population that we should use, but that's not what the Constitution requires. The plaintiff also alleges that the overcrowding engendered violence, and in support of this he cites one attack by inmate David Johnson, but he does not link this to overcrowding. It seemed, the way I read those allegations about overcrowding really fit into the unsanitary conditions that they were so crowded together when they had to sleep that if someone used the toilet that they were splashed with urine, they didn't have shoes so they had to walk in the filth. So I guess I would be more interested in having you discuss why that wasn't a constitutional violation. Sanitation, Your Honor. Yes. Sure. The plaintiff does have a few allegations about sanitation, of course. He discusses, he testifies that the toilet was inside the cell and the toilet would splash at times onto the floor, but he also says that the cells were cleaned. Well, but like dirty water coming all the way down the line of cells was the way I read the allegation. Well, the plaintiff did say that he never saw the mop water changed, but I mean as far as we're concerned that doesn't mean it wasn't. Can you, well, I mean we accept his allegations, right, in this posture of the case, right? Well, it's true, yes, that is true, Your Honor, but he doesn't necessarily know that it wasn't changed. He just didn't see it changed. But his allegation was that it didn't change, right? And that there was vomit and excrement and urine and on and on on the floors of the cell where he had to walk barefoot. No toilet paper, right? I mean that's what he alleges, or not sufficient toilet paper. Right, he does allege that the toilet paper wasn't in the cell with him and he had to ask for it. And sometimes he got it and sometimes he didn't, right? The plaintiff would, yes, would say that he didn't always go to the toilet paper. And that no eating utensils. And that's part of his allegation. Right, that the eating utensils, he had to use the side of a, they used the side of a styrofoam tray for eating utensils. And there's a reason for those restrictions because it's his own side. Well, I wanted to focus on Corporal Wright if I could. It seemed like to me you were making the argument that he didn't have control over Mr. Saunders' placement in the acute pod. Is that your argument? Yes, it is. But there's an affidavit from Corporal Wright saying that he oversaw the daily operations of the acute pod. Isn't there? There is an affidavit that Defendant Wright oversaw operations in the pod, but not that he controlled what inmates came in and out. Well, that he supervised the deputies in the unit, that's a quote from his affidavit? Yes. I just don't, I don't know how that comports with your argument that he didn't have control over it. Because the inmates, he didn't decide who came in and who went out. That's determined by mental health and Mr. Saunders. But I mean there's no dispute that Mr. Saunders was there. Right, but as far as how many people had to be in a cell, that was not up to Defendant Wright. He was a corporal, which is basically kind of a low-level manager, it's one step above deputy. You know, relieving watch deputies, making sure cells are cleaned. And then also with regard to Corporal Wright, I wanted to direct your attention to the August the 3rd incident where Mr. Saunders was beating his head against the door. Right. And the allegation is that Corporal Wright stood there and watched and laughed for five minutes. I mean that is the allegation, right? That is the allegation. I mean I couldn't, I mean that would allow a reasonable jury to find an Eighth Amendment violation, wouldn't it? I mean if you believe his allegations, if you accept his allegations as true, which we have to do at this stage, I mean that creates a jury question, doesn't it? As far as a condition, I mean our argument there would be that Mr. Saunders' subjective reaction to what he perceived as the cell that was too hot does not drive the analysis. Well, wait a minute. I mean you agree that the acute pod is for people that have mental health issues, right? Correct. Okay. And so if somebody's engaging in self-harming behavior, I mean that's part of, I mean that's one manifestation of a mental health problem, right? Yes, Your Honor. Okay. And so, I mean if that's why they're housed there and you see somebody engaging in self-harming behavior, then are you, I mean it seems like to me that certainly creates a fact question about whether there's a safety violation. Well, the claim is really unconstitutional. As far as the head beating incident that plaintiff highlights here is that it was a damage he suffered as a result of a hot cell, not that he's suing defendant right for failing to protect him from beating his head. Well, I think you read it a lot of different ways. So I would have thought, because I agree with Judge Martin that there, from this allegation there might be a fact question about the defendant's state of mind. But I thought your argument when you stood up and I thought it was the right way to go frankly was to say there are two prongs here. First you've got to show unconstitutional conditions of confinement and then you've got to show that he had a bad subjective state of mind and I'm going to focus on the former. Because as to bad subjective state of mind, I think that there are some facts in dispute here. But as to unconstitutional conditions, I don't know whether the head beating episode really shows anything about the conditions themselves or not. Tell me if I'm just missing this. That's exactly what my argument is, Your Honor. The plaintiff doesn't establish the cell was too hot. He just says that he beat his head against the wall in reaction to what he pursued. And if the officer sat there and laughed at him, then it might show that the officer had a bad subjective state of mind, which would prove prong two of this claim. Your point is that they haven't proven prong one of the claim? Am I understanding this? Exactly. Okay. All right. And that's your position with regard to the sanitary conditions as well? No objective violation? Correct, Your Honor. Let me ask you about that. I mean, if I didn't have toilet paper and I had to eat with my hands, I would consider that a serious safety concern. But with regard to having to sleep on the floor in the dirt, and this goes, I guess, to the subjective knowledge on the part of at least Corporal Wright, this evidence of the plastic platforms were brought in when there were visitors to the pod for the inmates to sleep on. And then when the visitors left, the plastic platforms were removed and they went back to sleeping on the floor. I mean, is that demonstrative of subjective knowledge of the problem? Well, I do know that is an allegation in the lawsuit. However, the mats don't violate the Constitution. That's the important part. It's not a violation of the Constitution to sleep on the mat on the floor. No. I mean, but doesn't it demonstrate subjective knowledge on the part of Corporal Wright, at least, that these platforms were brought in from time to time so that the inmates were not seen to be sleeping on this filthy floor? Well, I don't believe that the plaintiff said that Defendant Wright was the exact person who was bringing in these plastic boats. So whoever brought them in, your argument is that does not show any subjective knowledge of a problem? Correct. I'll acknowledge I'm out of time also, but I'll answer your question. Yes, because the mats do not violate the Constitution in and of themselves, there wasn't a violation to begin with. So saying that there was some other sort of bedding brought in at some certain point of time does not. But the inadequate cleaning of a cell could violate the Constitution? Not in this case. Right. I'm asking, it could. So what is it about this case that suggests the facts are clear and not in dispute about the inadequacy of the cleaning of the cells? Because the plaintiff does acknowledge that the cells were. Saunders said the prison orderlies cleaned the cells twice a week. As to whether and how often the water was changed between the cells, his testimony kind of changed. First he said that a lot of times, quote, unquote, they would not change the water between the cells. And then later he said he never saw them change the cells. Then there was an issue about cell flooding. Saunders said that inmates would occasionally flood the toilets in the cells, causing water to soak the mats. But he said the longest it ever took for the officers to come was 30 minutes. And he conceded the reason they didn't rush in was because of concern for officers' safety. And then we get to the issue that the inmates had, by his account, urinated and defecated on the floor in a cell. Saunders doesn't give you a particular incident, but he said that that generally happened. And at one point he says, it would not get cleaned up for several days, if I have the testimony accurate. Kenney said these incidents were usually cleaned up right away, but it had sometimes taken three to four hours to do it. Is that a fair summary of what we have here? Yes, it is, Your Honor. And in addition to that... Is that enough to put the fact in dispute? Not according to... About unsanitary conditions in the cell, which seems to me to be the most powerful argument they have. I'm just talking for myself. Even if you take the facts that the plaintiff advances, in conjunction with the deposition testimony that he submits in support of his opposition, involving Mr. Kenney, and Mr. Whiteley also says that everyone is removed and the cells are sprayed down if somebody gets feces on the cell. A short-term sanitation problem does not violate the Constitution. Cases where short-term sanitation was violated by the Constitution were much worse than this. Does not the plaintiff say, though, it wasn't short-term? He does argue that... Get an argument. An argument isn't a fact. Does he plead or offer a fact that the unsanitary conditions were not, quote, short-term, 30 minutes, 60 minutes, 90 minutes, till they could get a guard to come in and clean it up, but rather lasted days? There is one point in his deposition where he does say it lasted days, in contrast to the... If you believe that, why wouldn't that be enough to put into dispute a material issue of fact about unsanitary conditions? If we believe, not the part where he said 30 minutes, but the part where he said days... Yes, ma'am. Admittedly, he says more than one thing on the subject, but if a jury were to credit that it lasted days before they came in and cleaned it up, would that not violate the Constitution? Could a jury not find from that? That's the strongest argument he's got, as far as I can tell, and I want you to help me with that. It's a specific and precise allegation he makes. It depends on the amount of the sanitary problem he's talking about, because we cite a case, the Jacobi case, where there was urine splashing on the floor from the toilet in the cell that the inmates were exposed to human excrement, he says, sleeping on the floor next to the toilet as well, and that was not a violation in that case. We would argue this case is similar to that one, and that you can hold there was no violation as far as the sanitation. All right. Thanks very much. Good morning, Your Honors, and may it please the Court. My name is Coleman Watson. I'm for the appellee, Oprah Saunders, in this case. There are two things I want to highlight before I really get into the merits of the argument. The first is I think that we have an appellate jurisdiction problem, at least as to the Monel claim in the case, which I briefed in my papers. The appellant didn't discuss that in her argument, but I do want to highlight that first, because I think if we don't have appellate jurisdiction, we cannot go forward on the Monel claim. Are you talking about the claim against Sheriff Ivey? Yes. Okay. But that's the only one. I mean, the rest of it, we do have jurisdiction. That's correct, and I agree with that. There's a Monel claim. There are individual claims. I don't dispute there's jurisdiction over the individual claims where qualified immunity is at issue. Right. That's probably before the Court. Okay. However, I don't think the Monel claim against the Sheriff is inextricably intertwined with the issues of qualified immunity, such that this Court has jurisdiction to entertain that claim at this time. It's a non-appellable issue, starting with the notion of the Supreme Court Swent case, where the teachings of being inextricably intertwined handed down from an appeal from this Court. What we know is that the facts and the law have to be sufficiently similar in order for this Court to have jurisdiction over that issue. Here, if we take these two claims apart and look at solely the elements, for the individual defendants, we have to show, my client has to show, there's a constitutional right that was clearly established. For the Monel claims, the only commonality it shares with that set of claims is the fact that there has to be a constitutional violation. In the appellant's papers, they discuss a lot how if there's no constitutional violation for the individual defendants, there cannot be a constitutional violation for the Monel claim. I don't think that analysis is correct, and I don't think the case law actually supports that. For one thing, being for the right to be clearly established is not part of the Monel analysis at all. In fact, this Court has at least three times pointed out that in cases where you have Monel liability coupled with qualified immunity or individual liability, that almost always those are not intricately intertwined. I actually agree with you about that. I don't know if my colleagues have any questions about that. Can I turn you to Judge Presnell's order in this case? Yes, Your Honor. You did well, but there's some problems with that order, are there not? There are, Your Honor, and I think I even mentioned in my brief that there's an issue, especially with Defendant Jeter. I actually think the order is not correct as to Defendant Jeter, and I have no problem saying that on the record. I think the Court actually erroneously analyzed Defendant Jeter as though she was part of the Monel claim instead of analyzing her individually and seeing if she was entitled to qualified immunity. I don't think that . . . Did he talk about the subjective prong of the Eighth Amendment? As to Jeter? At all. I mean . . . No. Okay. No, he didn't. I mean, so . . . and then also, I think for the . . . in the qualified immunity analysis, I didn't see him say there was a constitutional violation that was clearly established. Am I right about that? You're also right about that. We did brief that issue, but it was not specifically addressed in the order. I mean, if we're all in agreement about that, then should . . . I mean, what are you asking us to do? Are you asking us to do that or to send it back for the district judge to do? Well, in all candor, I think the district court did make a mistake on the qualified immunity issue, and I have no problem saying that, but I do think that for the Monell claim, there's no jurisdiction over that issue for this court. I got that. Okay. But in terms of . . . I mean, talking about whether there was a clearly established constitutional violation, do you want us to do that or do you want us to send it back to Judge Personnel for him to do it? I have no problem arguing that here and having this court do that. And same for the subjective prong on the Eighth Amendment violation. Yes, Your Honor. So, our argument with respect to Defendant Jeter and Wright is both because of their positions in the jail, they were certainly aware of the totality of conditions of confinement on a daily basis. They observed the overcrowding, they observed the unsanitary conditions, and they observed the fact that inmates were not let out of their cells often for recreation. What is the . . . where is it in the record about exactly how often Corporal Wright was at the pod, at this acute pod? I don't . . . there's not an express allegation for the amount of time. I think there's a general allegation that as a supervisor or someone there, he was there whenever he was working, which was almost daily. And his affidavit says that he was in charge of it, right? I mean . . . That's correct. Yeah. The affidavit did say he was in charge. It just didn't say temporarily how long he's there. Okay. Help me with knowledge on the part of the defendants here, Jeter in particular, with respect to the unsanitary conditions. Well, our allegation with respect to the defendants . . . I know the allegation. It's the facts that I'm concerned about that are reduced in this record that would put that into controversy. They claim Saunders has failed to reduce the kind of evidence and has not raised a jury question concerning Jeter's knowledge of delivered indifference with respect to the sanitary conditions. He doesn't testify as to any incident in which Wright or Jeter refused to clean up any but he's referenced in a sort of a general kind of way the problem. And then with respect to the personal involvement on the part of Jeter, he offers . . . he points to letters and grievances he said, quote, would have been received by Jeter. It refers to a letter dated February 19th, 2009, six months after Saunders' first stint in the bubble ended in September of 2008. And the grievance referred to in the other grievance is about inadequate medical care he received after an incident in which Saunders was attacked by a fellow inmate. It doesn't say anything about unsanitary conditions. And then he points . . . you point to testimony from Kenny that several inmates brought the conditions of confinement to Jeter's attention and she said she would address them but that that never changed and she was, quote, hardly ever seen in the unit. Is that the totality of the evidence? It is, Your Honor. Is there anything else that I'm missing? No, as to my client, the allegation is that he followed the grievance process that required him to send the grievance . . . Right, but I focused specifically on what he said. Right. And that's why I'm just asking whether there's enough to put a fact dispute here with respect to Jeter. I think there is. Well, tell me why, I guess, is what I'm asking. Okay, I think there is because, at first, if you look at the inmate handbook, it codifies the process for grievances. It states that you have to first try to informally resolve the situation with an officer. If you can't do that, you ask for a grievance. The facility is supposed to give you a response back to that grievance. If you don't like the response, you can appeal it to the supervisor. That's where Jeter comes in. She was the supervisor. We do have a lot of grievances in this case that we received from the sheriff in the course of discovery, and there were no responses at all. Was Jeter ever deposed? She was. Was she ever asked in words or substance about this? Her testimony was she didn't recall receiving any of the grievances. Was she ever asked specifically about the two instances, the letter received February 19th, 2009, the one six months later, and the testimony of Kenny? She was. What did she say? She just did not recall receiving the grievances. They weren't routed to her. And as to Wright, the factual evidence that would suffice to establish his knowledge of the sanitation conditions would be what? Point me sort of specifically to what would support that claim. Well, I think the best evidence of that is Wright's own affidavit where he talks about being in the bubble area where these things are occurring. So by virtue of the fact of him coming to work every day, he can certainly observe the fact that the cells are crowded. We have a cell of somewhere between 100 and 135 square feet with seven to eight adult men. Looking at my table here, it looks like. They didn't always have seven to eight. I thought that number varied. It varied. Sometimes it was seven to eight. Sometimes it was five to six. Sometimes it was three to four. Wright, isn't that the testimony? That is the testimony. The only ratio that's correct in that analysis would be three to four under the Florida model jail standards. Of course, that doesn't yield a violation of the Constitution, even if it violated some penal code's recommendation. It might be suggestive. It might be illuminating. But that in and of itself doesn't yield a conclusion, Wright, that the Eighth Amendment is violated. That ordinarily is true. I think it does violate, however, when inmates are triple booked in cells, which is one of the allegations in the case. And I guess I feel like we sort of need to get back to first principles here because we started talking about appellate jurisdiction. The only thing we really have appellate jurisdiction to determine is whether or not the rights were clearly established, correct? There's a constitutional violation on the facts alleged and whether those rights were clearly established. That's correct. And so not about whether there was or wasn't a fact issue, but on the facts alleged, whether the right existed and was clearly established. That's correct. And so what clearly establishes, for instance, the law with respect to overcrowding? Not the prison overcrowding guidelines, but what? I did cite a couple cases on that issue in my summary judgment motion below, Your Honor. I guess it was the District Court who cited in the Supreme Court case Rhodes v. Chapman. I didn't really understand that, frankly, because the District Court said in Rhodes v. Chapman, double-selling does not violate the Eighth Amendment. Therefore, octuple selling does violate the Constitution. Clearly, that just doesn't even seem to follow to me. Right. And frankly, that's one of the problems of the order below. But our allegation is also not double-selling. It's triple-selling. So it would even exceed what courts have already found to violate the Constitution. So help me out with this. Which courts are we talking about? Not in this circuit. I think we cited a Sixth Circuit case, which is where that language came from, Your Honor. But which can't clearly establish the law for our purposes, right? Right. So is there a clearly established law on the overcrowding claim? I need to resort back to my brief. That's fine. I think I did cite that. And I guess, just in fairness, while you're looking, I have the same basic question for the sanitary conditions claim and the heat and ventilation claim. Right. Just having a hard time figuring out whether, as a matter of law, which is the only thing we have appellate jurisdiction determine, there is clearly established precedent for each of these various components of the claim. Right. Let me describe my brief. I thought my brief was here. So below, in my Memorandum of Law in Opposition to Summary Judgment at page 20, I do cite a few cases here. The first is on the issue of recreation being clearly established, and that is a Supreme Court case as of 1991. The second is the overcrowding issue, where, again, actually I cite a case from this court from 1991. That's the Hale v. Tallapoosa case. Just remind me what that case holds. I'm sorry, I just don't recollect it. It's actually a case about inmate-to-inmate violence, but it talks about how that is an outgrowth of overcrowding. So whenever you have overcrowding, you typically have inmate-to-inmate violence. Does Hale hold that seven to eight inmates in the cell of this size violates the Constitution? Hale does not have that language, Your Honor. What about Ham? Ham says, more generally, in assessing claims of unconstitutionally overcrowded jails, courts must consider the impact of the alleged overpopulation in a jail's ability to provide necessities, such as food, medical care, and sanitation. And then in Rhodes, the Supreme Court held double-selling does not amount to an Eighth Amendment violation, in part because it didn't lead to deprivations of essential food, medical care, or sanitation. Is there anything in Ham, our case, Hale, our case, Rhodes, the Supreme Court case, is there anything clearly establishing that seven or eight, particularly from the Supreme Court of the United States, would violate the Constitution? There's no language for seven or eight in those cases. However, I think when you look at the concept in the abstract, if you're talking about overcrowding, you have to have some basis to say what's overcrowding. You have to have some square foot to measure that bias. So to say seven or eight people are not overcrowding, that really depends on which space you're talking about. I don't doubt that you wouldn't need a case to say if they had 20 or 30 people in a cell that size, even without a case on point, that that could be clearly established, just with obvious clarity, that it would just be apparent to anybody. But that's not what you have here. You've got seven to eight, five to six, three to four on different occasions, and I don't see a case from the Supreme Court that would clearly establish that, as to say put the officer on notice that the overcrowding would violate the Constitution. Am I missing this? No, you're not missing it. Because you've got to point to some clearly established law, right? Right. That's correct under analysis. So you don't have that. At least I don't see it on the overcrowding. It seems to me the strongest claim you've got, again I'm just talking for myself, is on sanitation. But even there, I'm looking for you to point me to some clearly established law that would have put these two officers on notice that what they did or what they allowed to proceed amounted to a violation of the Eighth Amendment. What cases would clearly establish this violation for the inadequate cleaning? Well, I think that would be the Chandler case from this court from 1991 that talked about how you had to have basic hygiene items including soap and general sanitary conditions. Let's talk about the deprivation of the toiletries. I thought there was evidence that the reason that they didn't give them these utensils and some of these items to begin with was because of the fear of suicide risk presented by the inmates who were in the bubble. That was the reason why, as a general matter, they didn't provide this. Or utensils, that's correct. And there was no dispute about that in this record, right? No, not for metal utensils, no. Okay, and what about with respect to the soap and the toilet paper? Well, first there was no soap in the cells. That was the allegation in this case. Didn't they bring it whenever anybody asked for it that they'd get it within 45 minutes? Or maybe I've misunderstood the facts. The facts are not that the soap was always there. What was brought when it was asked was a toilet paper and sometimes there was a delay intentionally. Up to 45 minutes? Correct. Okay. When the inmates could see it right in front of them and the guard was sitting there doing nothing except not giving it to them is what the allegation is. And maybe just following along, aren't the cases that you're citing as clearly establishing the law, Chandler, Brooks, aren't those more extreme in fairness? Deprivations, permanent deprivations of these items? I think it's fair to say that, yeah, it's more extreme. However, I think our facts are still extreme enough to violate the Constitution. And clearly so, so as to provide the officers notice. Yes. Anything else that you had wanted to add? We didn't mean to cut you off here. No, I think you covered everything I would have otherwise covered. Thank you. Thank you very much. Thank you. Counsel, you had reserved four minutes for rebuttal. Thank you, Your Honor. I wanted to start off addressing the jurisdiction issue. The allegation as far as the plaintiff is concerned is that there's no jurisdiction to hear the Moneau claim because the claims are not inextricably intertwined because you have to go for clearly established law on qualified immunity. And the analysis is different for the sheriff. But if you find there's no constitutional violation, that takes care of both of the claims. It's not necessary to move on to clearly established for qualified immunity. It's not necessary to move on to policy in Moneau. If you find there's no constitutional violation to begin with, the analysis ends for both of the claims. Although in fairness, as Judge Marcus says, and I'm speaking only for myself, I think that your stronger position on qualified immunity is at the clearly established stage than it is at the merits of the constitutional violation stage. And if so, that may force you to forego the appellate jurisdiction on Moneau. Because if I at least think this is not a deprivation case but a clearly established case, then the qualified immunity and the Moneau claim are beginning to diverge. Correct? It's true that if the only reason that you find that there's no liability is that the law wasn't clearly established, then that would differ from the Moneau claim, yes. But I would ask that this court do the same thing it did in the Signature Pharmacy case that we cited where they found there was no Fourth Amendment false arrest case for the individual dependents, and then went ahead and took penitent jurisdiction over the Moneau claims for the same reason, that there was no violation of the Constitution. And that's our position as a whole anyway as far as all of the conditions. I think we talked about Commander Jeter and her involvement, and I just want to address one of the allegations that the plaintiff's counsel here made as far as her involvement and her knowledge. He cites the grievance policy, or at least the inmate handbook, where the inmates can appeal to a supervisor if they are not satisfied with the response they received to their grievance, and that necessarily means that's going to be Commander Jeter. There's no indication that that's the case. I mean, there are many levels of supervisors in the jail under Commander Jeter. I really am asking a record question here, because we read a lot of briefs and look at a lot of stuff to get ready for oral argument. But my understanding was that it seemed like Jeter got a copy of the February 17, 2009, letter. Didn't everybody seem to agree that that would have come to her, a letter addressed to the sheriff? I don't believe that's the case in the record, no. There was some deposition testimony from Major Dodds and those kind of pieced together to sort of infer that Commander Jeter would have probably received the letter, but no, it was never actually shown that she did, and she certainly didn't remember. But Saunders said, referring to this February 2009 letter that Judge Martin is referring to, that it would have been received by Jeter, and Jeter said, I don't remember. Is it not the state of the record? Well, I mean, respectfully, the point of Mr. Saunders . . . No, I'm just asking, is that the state of the record? It is, Your Honor. He did say that. Of course, he's in no position to know whether she would have received it or not, and whether he wanted her to receive it doesn't mean she did. But again, just so I'm understanding the tiering of the arguments, this is sort of a second and independent basis upon which Jeter might be entitled to summary judgment, in your estimation, because he wasn't personally involved, and if there's no clearly established law in the first instance, then none of this matters? Is that right? Well, that is true. If there's no clearly established law, there is no liability for us, and . . . And separately, if there were, then if he weren't personally involved, there'd be a basis for summary judgment. Correct. This is a distinct argument that you're making. Yeah, I just want to make clear that I've got it straight in my head. Mark . . . Issue one, was there a violation of a constitution? Issue two, was it clearly established? Issue three, even assuming arguendo A and B are met, can you attribute it to these defendants in this case? That is to say, Jeter and Wright. And your position is you can't because they didn't know enough, they weren't present, they didn't have the authority, et cetera. But that's a distinct and independent argument from whether or not there was a violation of the Eighth Amendment and distinct from the second question of whether the law was clearly established. Right? That is an additional requirement for qualified immunity for the person to be directly involved. All right. Thank you very much. The next case would be Spencer versus the City of Orlando.